IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

SANDRA M. HERTENSTEIN           )
                                )
v.                              )  No. 3:05-0569
                                )  Judge Wiseman/Bryant
JO ANNE B. BARNHART, Commissioner)
of Social Security              )

To:  The Honorable Thomas A. Wiseman, Jr., Senior Judge

**REPORT AND RECOMMENDATION**

This is a civil action filed pursuant to 42 U.S.C. §405(g), to obtain judicial review of the final decision of the Commissioner of Social Security denying plaintiff disability insurance benefits ("DIB"), as provided under Title II of the Social Security Act ("the Act"), as amended. Plaintiff was represented by counsel at the agency level, but filed the instant case *pro se*. The case is currently pending on plaintiff's motion for judgment (Docket Entry No. 10), to which defendant has responded (Docket Entry No. 11). Plaintiff has further filed a reply to defendant's response (Docket Entry No. 13). For the reasons stated below, the Magistrate Judge recommends that plaintiff's motion be DENIED, and that the decision of the Commissioner be AFFIRMED.

1

## I. Introduction

Plaintiff filed her application for DIB on April 2, 2002, alleging disability since May 28, 1998 due to an impairment to her back and left leg (Tr. 47-50, 67). Through counsel, she later amended her alleged onset of disability at the administrative hearing, claiming that her disability in fact commenced on August 2, 2000 (Tr. 200). Plaintiff's claim was denied at both the initial and reconsideration stages of agency review (Tr. 29-31, 34-35).

Plaintiff thereafter requested and received a hearing before an Administrative Law Judge ("ALJ"). On July 21, 2004, plaintiff and her counsel appeared at the administrative hearing, where testimony was given by plaintiff, her daughter, and an impartial vocational expert (Tr. 196-218). On November 24, 2004, the ALJ issued a written decision denying plaintiff's claim (Tr. 12-18). The ALJ made the following findings:

1. The claimant met the nondisability requirements for a period of disability and disability insurance benefits set forth in Section 216(i) of the Social Security Act and was insured for benefits through June 30, 2004.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's degenerative disc disease of the lumbar spine is a "severe" impairment, based upon the requirements in the Regulations (20 CFR § 404.1520(c)).

4. This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

2

5.  The claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The claimant has the following residual functional capacity: full range of medium work.

7.  The claimant's past relevant work as all did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR § 404.1565).

8.  The claimant's medically determinable degenerative disc disease of the lumbar spine does not prevent her from performing her past relevant work.

9.  The claimant is not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(f)).

(Tr. 17-18).

On May 23, 2005, the Appeals Council denied plaintiff's request for review of the decision of the ALJ (Tr. 4-6), thereby rendering that decision the final decision of the Commissioner. This civil action was thereafter timely filed *pro se*, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based on the record as a whole, then these findings are conclusive. Id.

## II. Review of the Record

Neither party having endeavored to summarize the medical record, the following is a restatement of the ALJ's record review (Tr. 13-15):

Plaintiff was involved in a single-car motor vehicle accident on August 2, 2000. She sustained abrasions on her face, right breast and left arm. She denied neck and back pain. On August 6, 2000, plaintiff returned to the emergency room with complaints of lower back pain from her motor vehicle accident. She was treated with medication and given a note for three days off work (Tr. 127-135). X-rays on August 14, 2000, were normal except for early spondylosis of L3, L4 and L5. (Tr. 166-189).

On October 4, 2000, Dr. Robert Hudson, plaintiff's treating physician, advised plaintiff to walk one to two miles each day. In February 2001, Dr. Hudson began prescribing Lortab, a narcotic analgesic pain reliever.[1] (Tr. 166-189).

Dr. Steve Salyers reported on March 12, 2001, that plaintiff was healthy appearing and able to heel and toe walk without difficulty. An examination revealed bilateral flat feet, forward flexion almost to the floor, tenderness over the lumbar and

---

[1] While Lortab was first prescribed in February 2001, the same drug (which combines the narcotic analgesic/antitussive hydrocodone bitartrate with acetaminophen) was prescribed by Dr. Hudson under the brand name Lorcet as early as August 2000 (Tr. 173). Preparations of this same drug, which is indicated for the relief of moderate to moderately severe pain, are also available under the brand names Vicodin, Anexsia, and Co-Gesic, to name a few. http://www.healthsquare.com/newrx/vic1480.htm.

4

buttock area, very minimally positive straight leg raises, symmetric deep tendon reflexes, normal strength, no pain with hip rotation, full knee range of motion and intact pulses. X-rays showed a little straightening of the normal lumbar lordosis and early osteophyte formation at L4-5. A lumbar magnetic resonance imaging (MRI) showed very subtle disc bulging at L4-5 and L5-S1 with desiccation of the L3-4 disc. (Tr. 136-140).

An examination on March 20, 2001, revealed excellent lumbar mobility, minimal lumbar tenderness, negative straight leg raises, normal strength, full and painless hip range of motion and some decreased sensation in the left lower leg. Plaintiff received a lumbar epidural steroid injection on March 23, 2001. An examination on April 11, 2001, revealed tenderness over the lumbar and buttock areas, full lumbar range of motion, full hip range of motion, negative straight leg raises, intact sensation, absent lower extremity reflexes and intact pulses. Plaintiff refused a repeat lumbar epidural steroid injection. (Tr. 136-140).

Plaintiff told Dr. Hudson on May 1, 2001, that her MRI showed a herniated disc. (Tr. 166-189).

Plaintiff saw Dr. Keith Starkweather, an orthopaedic surgeon, for a hip evaluation on August 1, 2001. Movement of plaintiff's hip against resistance did not reproduce any symptoms and an examination of her hip joint was normal. Dr. Starkweather

5

did not prescribe any medications. (Tr. 141).

An electromyograph on August 7, 2001, was normal and an examination revealed normal lumbar functions, negative straight leg raises, good strength, symmetrical reflexes and no atrophy. (Tr. 142-43).

Dr. Richard Berkman, a neurosurgeon, reported on July 10, 2001, that plaintiff spoke slowly but answered questions appropriately and had negative straight leg raises, normal muscle mass, normal strength, normal sensation, normal reflexes and painless hip range of motion. Dr. Berkman reviewed plaintiff's MRI and reported that it was normal. Dr. Berkman also reported that plaintiff's medications were excessive for a patient without imaging study abnormalities. Dr. Berkman recommended pain management and a decrease in medications. (Tr. 144-46).

In September 2001, plaintiff told Dr. Hudson that Dr. Starkweather gave her Oxycontin, a narcotic pain reliever. Dr. Hudson encouraged plaintiff to engage in activity and prescribed more Lortab. Records for Dr. Hudson for 2002 and 2003 indicate that he prescribed Lortab and encouraged plaintiff to exercise. (Tr. 166-189).

At the request of the Social Security Administration, plaintiff saw Dr. Donita Keown on June 4, 2002. She complained of daily stiffness, aching pain, lumbar spasm, depression, poor sleep and headaches. Dr. Keown reported that plaintiff was

6

neatly groomed with makeup and styled hair, good visual acuity, blood pressure within normal limits, significant pain behavior and symptom magnification. Plaintiff had pain with manipulation of her lower limbs, full range of motion in the knees and ankles, slightly limited hip range of motion, limited lumbar range of motion, great discrepancy between seated and supine straight leg raises, normal reflexes, full strength, normal gait and station and no spasm or scoliosis. X-rays showed degenerative disc disease at L3-4 and L4-5. Dr. Keown reported that plaintiff was able to sit, stand and walk six hours each in an eight-hour workday, but reserved assessment of lifting and carrying ability pending the aforementioned x-rays. (Tr. 147-151).

On January 10, 2003, Dr. Hudson reported that plaintiff was limited to: lifting/carrying five pounds occasionally; standing/walking one hour in an eight-hour workday, ten minutes at a time; sitting thirty minutes in an eight-hour workday, not in a straight-backed chair, ten minutes at a time; never climbing, kneeling, crouching, balancing or crawling; occasionally stooping; and reaching, pushing and pulling on a limited basis. (Tr. 166-189).

In August, October and November 2003, Dr. Hudson called in prescriptions for Lortab, sixty pills with two refills. He did the same in March and April of 2004. (Tr. 190-95).

At her administrative hearing, plaintiff testified that she

7

was forty-four years old, and had obtained her GED (Tr. 199). She testified that she was living with her husband, daughter, and granddaughter, and had last worked in August 2000 (Tr. 200). She testified that Dr. Hudson had been treating her since well before her accident in August 2000, and that he had referred her to a pain clinic, but she decided not to go because she felt Dr. Hudson could monitor her medication as well as the pain clinic (Tr. 206). She testified that she was experiencing terrible low back pain on the day of the hearing, rating it a 7 on a scale from 1 to 10 (Id.). She took Lortab to control the pain, which helped, but did not eliminate the pain (Id.). She testified that her pain was always present, and caused her to lose sleep (Id.). In addition to the medication, she would attempt to relieve the pain by sitting on pillows, lying down, using a heating pad, and taking hot showers (Id.).

Plaintiff testified that she was not under the care of a psychologist or psychiatrist, but was satisfied with Dr. Hudson's medical management of her depression (Tr. 207). She testified to engaging in almost no physical activity, being able to wash only two or three dishes, and being unable to sit or stand comfortably for more than 10-15 minutes (Tr. 208). She testified that she did not drive, but was driven where she needed to go by her daughter (Id.). She smokes about a pack of cigarettes a day (Tr. 209).

8

Plaintiff's daughter corroborated her mother's testimony, stating that six out of seven days her mother required bed rest, and was unable to do the housework (Tr. 212). She testified that her mother was independent before her car wreck in August 2000 (Tr. 213).

### III. Conclusions of Law

#### A. Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. Jones v. Sec'y of Health & Human Servs., 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. Landsaw v. Sec'y of Health & Human Servs., 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999)(citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." Bell v. Comm'r of Soc. Sec., 105 F.3d 244, 245 (6th Cir. 1996). Even if

9

the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. Her, 203 F.3d at 389 (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. Hurst v. Sec'y of Health & Human Servs., 753 F.2d 517, 519 (6th Cir. 1985).

B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process, as follows:

(1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
(2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
(3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[2] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

---

[2]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

10

(4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a <u>prima facie</u> case of disability.

(5) Once the claimant establishes a <u>prima facie</u> case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

<u>Moon v. Sullivan</u>, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination. <u>Id.</u> In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's <u>prima facie</u> case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. See <u>Varley v. Sec'y of Health & Human Servs.</u>, 820 F.2d 777, 779 (6th Cir. 1987).

11

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. § 423(d)(2)(B).

## C. Plaintiff's Statement of Errors

Plaintiff takes issue with a number of the ALJ's findings, though the only allegations of prejudicial error appear to be the allegations that her treating physician's opinion was improperly discounted, that her degenerative disc disease is a disabling impairment, and that the ALJ failed to consider the MRI evidence which revealed the presence of probable Schmorl's nodes (raised in her reply brief, Docket Entry No. 13). Plaintiff further argues that the ALJ's decision is defective in the following, relatively minor particulars: he stated that Dr. Hudson first prescribed Lortab in February 2001, when the proof shows that Lortab was first prescribed in August 2000; he stated that the records do not indicate that Dr. Starkweather prescribed Oxycontin, though plaintiff has the pharmacy record and pill bottle to prove otherwise; he reported her July 2000 statement that she was able to babysit her 25 pound grandchild, despite the fact that this statement preceded her August 2000 motor vehicle accident; and, he neglected to find that her past relevant work

12

as a screen printer was ruled out, despite the VE's testimony to that effect.

Considering the more minor alleged errors first, plaintiff correctly notes that narcotic pain medication was first prescribed by Dr. Hudson in August 2000 following plaintiff's accident, though that prescription was for Lorcet instead of Lortab, a difference in name only.[3]  The Lorcet prescription was apparently continued during 2000, and was changed to Lortab in February 2001 (Tr. 172-73).  The ALJ's failure to note the earlier prescription of Lorcet is not particularly harmful, however, as it is clear that he considered plaintiff's use of narcotic medications during the relevant time period, but was persuaded by the lack of objective findings to agree with Dr. Berkman that plaintiff was overmedicated (Tr. 16).  As to plaintiff's alleged prescription for Oxycontin (a controlled release narcotic used for around-the-clock relief of moderate to severe pain)[4], her pharmacy records and pill bottle were not before the ALJ, who properly cited the absence of any medical record of this prescription.  As to the ALJ's citation of plaintiff's report of activities during July 2000, the month preceding her accident, this cannot be deemed erroneous inasmuch as it was merely mentioned in a recitation of the proof of

---

[3]Supra n.1.

[4]http://www.healthsquare.com/newrx/oxy1625.htm.

13

plaintiff's daily activities (Tr. 15-16), and further because plaintiff had originally alleged May 28, 1998 as the date of disability onset (Tr. 200). Lastly, regarding the VE's testimony that the screen printer job would no longer be available, that testimony was elicited in response to a hypothetical that described an exertional RFC for light work (Tr. 216), while plaintiff was found to possess an RFC for medium work (Tr. 17) which would fit the requirements of the screen printer job (Tr. 214).

With respect to the allegations of error dealing with the ALJ's weighing of the medical evidence, it is well established that the diagnoses of degenerative disc disease, bursitis, and sciatica cannot alone prove plaintiff's disability. See Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988). Even if such diagnoses are properly supported by medical signs, symptoms, and laboratory findings in the record, they will not establish plaintiff's disability absent the necessary proof of resulting functional limitations with which the disability analysis is ultimately concerned. The inquiry in these cases focuses on what the claimant can still do despite her impairments, and thus the mere fact of plaintiff's diagnoses -- as well as the fact that plaintiff has an acquaintance who receives benefits on account of the same condition (Docket Entry No. 10, p. 2) -- is not persuasive.

Moreover, the ALJ did consider the MRI results dated March 13, 2001 (Tr. 14), but neglected to mention the finding of "probable Schmorl's nodes at multiple levels" (Tr. 140). While plaintiff contends that this finding establishes the disabling severity of her back condition, the proof suggests otherwise, as a nurse practitioner in Dr. Salyers' office did not consider the finding significant (Tr. 137), and the reviewing state agency physician described the Schmorl's nodes as "minor spondylotic changes" (Tr. 162). This medical proof is consistent with the fact that "Schmorl's nodes are common, especially with minor degeneration of the aging spine[, and] ... usually cause no symptoms, but reflect that 'wear and tear' of the spine has occurred over time."[5]

Finally, plaintiff argues that the opinion of her treating physician, Dr. Hudson, should have been credited. However, as the ALJ noted (Tr. 15), it appears that Dr. Hudson's highly restrictive assessment of plaintiff's work-related abilities (Tr. 191-93) is at odds with all other medical evidence of record.[6]

---

[5] http://www.medterms.com/script/main/art.asp?articlekey=14007

[6] The government further argues that Dr. Hudson's status as a treating physician is irrelevant with respect to his assessment of plaintiff's work-related abilities, since such abilities are ultimately the subject of the RFC finding, a finding that is reserved to the Commissioner. 20 C.F.R. § 404.1527(e). However, this argument appears to be misplaced, as Dr. Hudson's assessment of work-related abilities is a "medical source statement," not an RFC assessment (i.e., medium, light, sedentary) as contemplated in § 404.1527(e). See Soc. Sec. Rul. 96-5p, 1996 WL 374183, at *4-5 (S.S.A. July 2, 1996)("Medical source statements submitted by treating sources provide medical opinions which are entitled to special significance and may be entitled to controlling weight on issues concerning the nature and severity of

15

His continuing prescription of narcotic pain medication has been questioned on this record by Dr. Berkman (Tr. 144, 145), and neither his medical source statement nor his pertinent treatment notes (Tr. 169-173) contain any examination findings which would support his opinion as to disability.  His opinion is also flatly contradicted by the largely normal examination findings of Drs. Salyers, Starkweather, and Berkman, and are likewise inconsistent with the examination findings and RFC assessment of Dr. Keown, who noted some limitation in range of motion, but also observed "significant pain behavior, magnification [of] symptoms," normal reflexes, full strength, unimpaired station and gait, and great discrepancies between results on sitting versus supine straight leg raising, leading her to assess an ability to sit, stand, or walk up to six out of eight hours (Tr. 148-150).  While treating physicians are entitled to substantial deference when their opinions are supported by sufficient clinical findings and are consistent with the evidence, <u>Bogle v. Sullivan</u>, 998 F.2d 342, 347-48 (6th Cir. 1993), such is clearly not the case here.

        In sum, the decision of the Commissioner is supported by substantial evidence, and must therefore be affirmed.

---

the individual's impairment(s). ... Although an adjudicator may decide to adopt all of the opinions expressed in a medical source statement, a medical source statement must not be equated with the administrative finding known as the RFC assessment.").

16

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment be **DENIED**, and that the decision of the Commissioner be **AFFIRMED**.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 30th day of August, 2006.

    s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE